UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 1:24-cr-457 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | James E. Grimes, Jr. |
| TIAWAN TAYLOR, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

A grand jury returned an indictment charging Defendant Tiawan Taylor with possession with intent to distribute methamphetamine and possession with intent to distribute cocaine. In March 2025, Defendant filed a motion to suppress. The Court referred the matter to the Magistrate Judge who, after holding a hearing, issued a report and recommendation that the Court deny the motion. Defendant objects to the report and recommendation. For the reasons that follow, the Court **OVERRULES** Defendant's objections and **ADOPTS** the report and recommendation **DENYING** Defendant's motion to suppress.

## STATEMENT OF FACTS

In July 2024, Mr. Taylor showed up at a residence in Lorain, Ohio, and a woman who lived there let him in. (ECF No. 19-1, PageID #95.) Mr. Taylor arrived between 2:00 p.m. and 3:00 p.m. and sat on a couch visible from the front door. (*Id.*, at PageID #95.)

Mr. Taylor removed three bags from his pockets that contained what appeared to be controlled substances and a large amount of cash. (*Id.*, at PageID #95–96.) Next, Mr. Taylor rolled and smoked a blunt using a combination of the controlled substances that he previously removed from his pockets. (*Id.*, at PageID #96.) Then, he fell asleep on the couch. (*Id.*)

As he slept, the woman went to a neighbor's house and used the neighbor's cell phone to call the police. (*Id.*; ECF No. 28, PageID #140–41.) During the call, the woman identified herself to Detective Craig Payne, who happened to answer, and explained that she was using a neighbor's phone to make the call. (*Id.*, PageID #140–42.) She informed Detective Payne that Mr. Taylor was in her home, on her couch in a room to the right of her front door. (*Id.*, PageID #142; ECF No. 19-2, PageID #102.) Finally, she stated that there were outstanding arrest warrants for Mr. Taylor, then she hung up. (ECF No. 19-2, PageID #102.)

A little while later Detective Payne called the number back. *Id.* A man answered and said he was a neighbor of the woman who called. (*Id.*; ECF No. 28, PageID #141.) The man reiterated that Mr. Taylor was sleeping at his neighbor's house. (ECF No. 19-2, PageID #102; ECF No. 19-1, PageID #94.)

Detective Payne and other officers reviewed biographical and photographic information about Mr. Taylor and went to the house where he was sleeping. (ECF No. 19-2, PageID #102.) The events at issue were captured on Detective Payne's body-camera. The residence has two doors, a storm door and a main front door. (ECF No. 19-2, PageID #102.) Both doors have their hinges on the left side and their

2

handles on the right side of the door. (Body Camera Footage, Ex. C at 17:11:29.) However, the storm door does not have an outer handle, so it can only be opened from the inside. (*Id.*) When opened, the front room to the right of the door is visible. (*Id.* at 17:11:55.)

Detective Payne knocked on the front storm door; after a few seconds, someone opened the main door. (*Id.*) The video did not capture who opened the door. However, when the main door opened, it was open wide enough for Detective Payne to see inside the residence briefly. (*Id.* at 17:11:55-17:12:00.) Because of the information provided during the earlier phone call, Detective Payne believed that Mr. Taylor was on the couch in the room to the right of the front door. (ECF No. 19-2, PageID #102.) In his police report and when testifying, Detective Payne stated that, when the door opened, the couch and Mr. Taylor were visible through the storm door. (*Id.*; ECF No. 28, PageID #146.) The main door remained open for roughly five to six seconds before it was shut. (Body Camera Footage, Ex. C at 17:11:55-17:12:00.) In that time, Detective Payne states that he was able to visualize Mr. Taylor sleeping on the couch. (ECF No. 19-2, PageID #102; ECF No. 28, PageID #146.)

As the main door slowly began to close, Detective Payne ordered the door open. (ECF No. 28, PageID #145; Body Camera Footage, Ex. C at 17:12:00-06.) A woman reopened the main door and moved toward the storm door. (*Id.* at 17:12:02.) Then, Detective Payne again ordered the woman to open the door. (*Id.*, at 17:12:05.) She attempted to open the storm door using the internal handle. (*Id.* at 17:12:06-10.) At

3

the same time, Detective Payne told the other officers that Mr. Taylor was running through the house. (ECF No. 19-1, PageID #94; ECF No. 19-2, PageID #102.)

The body-camera footage shows an officer ordering Mr. Taylor to come to the front door of the residence. (ECF No. 19-1, PageID # 94; ECF No. 19-2, PageID #102; Body Camera Footage, Ex. C at 17:12:20.) Then, officers entered the residence and ordered Mr. Taylor to lie on the ground and place his hands behind his back. (ECF No. 19-2, PageID #102.)

Detective Payne noted in his report that Mr. Taylor appeared highly intoxicated after allegedly swallowing some unknown substance while the arrest occurred. (ECF No. 19-1, PageID #95; ECF No. 19-2, PageID #103.) Detective Payne attended to Mr. Taylor while waiting for an ambulance to arrive. (*Id.*) Detective Payne, as seen on the body-camera footage, advocated for the responding emergency medical technicians to complete a status check on Mr. Taylor who appeared to be sweating profusely and drooling. (Body Camera Footage, Ex. C at 17:26:00.)

Officers found controlled substances on the couch where Mr. Taylor was sleeping. (ECF No. 19-1, PageID #95; ECF No. 19-2, PageID #102–03.) Later field testing indicated that the contents of the bags were positive for both cocaine and methamphetamine. (ECF No. 19-1, PageID #100.)

**STATEMENT OF THE CASE**

Defendant moved to suppress the evidence seen and seized by officers, arguing that these items were fruits of an unlawful warrantless search and entry. (ECF No. 19.) The Court referred the case to the Magistrate Judge, who held an

evidentiary hearing. On April 11, 2025, the Magistrate Judge issued a report and recommendation that the Court deny Defendant's motion to suppress. (ECF No. 26.) The Magistrate Judge made findings of fact and determined that Defendant failed to show he had a reasonable expectation of privacy in the residence because no evidence gave him anything more than a casual connection to it. (*Id.*, PageID #126–27.) Further, he recognized that the officers had reason to believe that he would be in the residence when they entered and that they had authority to arrest him. (*Id.*, PageID #127.)

Defendant timely objected to the Report and Recommendation on both factual and legal grounds. (ECF No. 27.) Specifically, Defendant objects that, although the documentary evidence reports an anonymous phone call, the detective testified that the caller was the resident of the house. (*Id.*, PageID #130–31.) Based on his factual objections, Defendant argues that the police did not have a lawful basis to enter the home and that he has standing to challenge the search. (*Id.*, PageID #133.)

## STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(B) a judge may designate a magistrate judge to "conduct hearings, including evidentiary hearings" and submit "proposed findings of fact and recommendations for the disposition . . . of any motion excepted in subparagraph (A)." A motion to suppress falls within the exception in subparagraph (A); therefore, the Court reviews Defendant's objections de novo. *United States v. Raddatz*, 447 U.S. 667, 674 (1980). Similarly, under Rule 59(b)(3) of the Federal Rules of Criminal Procedure, the district judge must "consider de novo

any objection to the magistrate judge's recommendation." The judge "may accept, reject, or modify the recommendation. *Id.*

When conducting a de novo review, a court is not required to re-hear the matter, including any contested or disputed testimony. *Raddatz*, 447 U.S. at 674. Instead, the court makes a "de novo *determination*" of the portions of the record to which there is an objection. *Id.*

## ANALYSIS

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. "'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. U.S. Dist. Court for E. Dist. of Mich.*, 407 U.S. 297, 313 (1972)).

**I.    Standing**

Defendant objects to the Magistrate Judge's finding that he was not an overnight guest at the residence and, therefore, lacked standing to challenge the search and his arrest. Defendant argues that because he was a guest sleeping at the Residence, he qualifies as an overnight guest. (ECF No. 27, PageID #133.)

To have standing to contest a search, a defendant must have a legitimate expectation of privacy in an area searched or item seized. *United States v. Jenkins*, 743 F. App'x 636, 647 (6th Cir. 2018). "A legitimate expectation of privacy exists when a defendant, by his conduct, has exhibited an actual (subjective) expectation of privacy—that is, has sought to preserve something as private—and when his subjective expectation of privacy is one that society is prepared to recognize as reasonable." *United States v. Mathis*, 738 F.3d 719, 729 (6th Cir. 2013) (citing *Smith v. Maryland,* 442 U.S. 735, 740, 99 (1979)) (cleaned up).

The Supreme Court has held that an individual's status as an overnight guest shows an expectation of privacy. *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990). "People—whether renters, couch surfers, or nomads—have a reasonable expectation of privacy in places that function as home." *United States v. Allen*, 720 F. App'x 254, 257 (6th Cir. 2018). In determining whether an individual has a legally sufficient interest in a place other than his own home to claim Fourth Amendment protections, courts look to the nature of the individual's ties to the property. *United States v. Haynes*, 108 F. App'x 372, 374 (6th Cir. 2004) (quoting *United States v. Harris*, 255 F.3d 288, 294 (6th Cir. 2001)). A defendant has the burden of establishing standing to challenge a search. *United States v. Jenkins*, 743 F. App'x 636, 648 (6th Cir. 2018).

Here, the record contains no evidence suggesting Mr. Taylor previously stayed overnight at the residence or was planning to do so that evening. Defendant did not have personal belongings on him to indicate that he intended to stay at the residence for any prolonged period. The evidence shows that Mr. Taylor consumed intoxicating

7

substances and fell asleep on a couch at the residence. Nor was he present there for a considerable time before his arrest, staying less than three hours. In his objections, Defendant odes not claim that he intended to stay the night, previously stayed there, or was welcome to stay the night. Instead, he was invited into the house as a guest by the owner (or leaseholder). To put it another way, he was merely present with that person's consent, making him ineligible to claim the protections of the Fourth Amendment. *See Minnesota v. Carter*, 525 U.S. 83, 90 (1998). At bottom, Defendant fails to carry his burden. *See United States v. Haynes*, 108 F. App'x 372, 375 (6th Cir. 2004) (citing *United States v. Talley,* 275 F.3d 560, 563 (6th Cir.2001); *United States v. Smith,* 783 F.2d 648, 650 (6th Cir.1986)).

Defendant relies on *Minnesota v. Olson*, 495 U.S. 91 (1990), to support his argument. But the facts of *Olson* are distinguishable. There, the defendant was a true overnight guest with clear permission to stay at the residence. Among other things, he had a change of clothes with him. *Id.* at 97 n.6. In contrast, Mr. Taylor had no personal belongings with him—other than controlled substances. Yes, he might have had permission of some sort to be in the residence. That fact alone, however, does not establish standing. Still, the record leaves questions about whether Mr. Taylor entered the residence with permission or consent. After all, the woman who lived there went next door and called the police.

On de novo review, the record does not establish that Mr. Taylor has standing to challenge the search.

8

## II. Probable Cause

Defendant objects to the Magistrate Judge's finding that there was probable cause for the search of the residence that turned up contraband and for his arrest. Defendant argues that, if the resident called the police, she would have readily allowed police to enter instead of closing the door after seeing the officers. (ECF No. 27, PageID #132.) She might have had any number of motivations in closing the door when the police arrived. Perhaps she had second thoughts. Perhaps she wanted to check to see if Mr. Taylor had woken up before allowing them to enter. Whatever the case, Detective Payne's testimony is consistent with the footage from his body camera. For these reasons, his testimony is credible and supports the lawfulness of his actions and those of the police.

During the initial call, which Detective Payne fielded, the caller identified Mr. Taylor by name, reported (apparently correctly) that he had multiple warrants for his arrest, and advised that he could be found at the Residence. (ECF. No. 19-1, PageID #94.) Then, on the return call that Detective Payne initiated, the man who answered provided corroborating information and requested police assistance. (ECF No. 28, PageID #141; ECF No. 19-1, PageID #94.) Defendant asks the Court to adopt the facts as stated in Detective Payne's report, that the first call was anonymous, rather than credit the testimony he provided later, that the call came from the resident. (ECF No. 27, PageID #132.) Defendant claims that Detective Payne's testimony is inconsistent with both the police report he authored and the contemporaneous body camera footage. (*Id.*)

9

But Detective Payne's report, not naming the caller, and his testimony are not inconsistent. His report does not exclude the resident as the caller. For this reason, the Court finds the Detective Payne's testimony at the suppression hearing credible. *See United States v. Blair*, 524 F.3d 740, 749 (6th Cir. 2008) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985)). Additionally, Defendant was able to cross-examine Detective Payne about the discrepancies between his written report and his testimony. *See Dortch v. Fowler*, 588 F.3d 396, 403–05 (6th Cir. 2009) (holding that the lower court did not abuse its discretion in admitting both the report and the officer's testimony given the opportunity for cross-examination to challenge any discrepancies.)

On de novo review of the relevant documents including the police report, Detective Payne's testimony, and Detective Payne's body camera footage, the Court finds that Detective Payne's testimony recounting the events is credible.

## CONCLUSION

For these reasons, the Court **OVERRULES** Defendant's objections (ECF No. 27) and **ADOPTS** the Magistrate Judge's report and recommendation (ECF No. 26) **DENYING** Defendant's motion to suppress (ECF No. 19). The Court **DENIES AS MOOT** the motion of the United States for an extension of the deadline to respond to Defendant's objection (ECF No. 29).

**SO ORDERED.**

Dated: June 2, 2025

J. Philip Calabrese
United States District Judge
Northern District of Ohio